IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MARK E. BROWN,

Plaintiff,

vs.                                    Case No. 10-1096-JTM

UNIFIED SCHOOL DISTRICT NO. 501,
SHAWNEE COUNTY, STATE OF KANSAS,

Defendants.

MEMORANDUM AND ORDER

This is an action for employment discrimination by Mark E. Brown against the
Unified School District No. 501, which serves Shawnee County, Kansas. Brown, who is
black, was previously employed by the District until 1996, when he voluntarily resigned.
He contends the District racially discriminated against him and engaged in illegal
retaliation when it refused to rehire him in 2009. Brown previously has instituted two
unsuccessful lawsuits against the District. The District contends that the present action
reflects a long-standing decision that Brown is not eligible for rehire because of his
employment history, and has moved for summary judgment.

Summary judgment is proper where the pleadings, depositions, answers to
interrogatories, and admissions on file, together with affidavits, if any, show there is no
genuine issue as to any material fact, and that the moving party is entitled to judgment as
a matter of law.  Fed.R.Civ.P. 56(c).  In considering a motion for summary judgment, the
court must examine all evidence in a light most favorable to the opposing party. *McKenzie
v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary

judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

The following findings of fact exclude requested findings, or attempts to place facts in controversy, which are not premised on admissible evidence, or where the cited evidence fails to support the requested finding.

## *Findings of Fact*

Between about 1980 and 1996, Brown was employed by District 501 as a physical education teacher and, for parts of that period, as a coach.

Brown was previously employed as a physical education instructor by the Junction City, Kansas school district, which decided not to renew his contract. His personnel file with District 501 contains a January, 1982 reference from the Junction City school district rating him below average in 12 of 17 categories, and stating that it would not employ him again at that time. Brown considers that reference a negative document in his personnel file.

The file also contains a February 5, 1985 evaluation of his teaching physical education, reflecting concerns about his professionalism in dealing with one staff member and at least one set of parents, and stating there were concerns about inappropriate comments to students. Brown agrees that is a negative document.

In 1989, Brown coached girls junior varsity basketball at Topeka High School. One of the student's parents complained about comments she said that plaintiff made to K.R., her daughter, prompting an investigation by the District.

K.R., a freshman, told the investigator that Brown suggested breaking up with her boyfriend, having a candlelight dinner with him and "doing the wild thing." B.G., another freshman student, stated that she heard Brown ask K.R. to "do the wild thing." (Brown dep. exh. 13, at 3, 5). Brown understands "doing the wild thing" means sexual intercourse. Two other students on the basketball team reported to Principal Nusbaum that Brown often used the expression "stop dickin' around" to the girls.

Brown agrees that if a school district had an indication a teacher propositioned or asked out a student, that would be a reason to not want to hire that person. He also agrees that it is highly inappropriate to say "stop dickin' around" to high school girls.

As a result of the investigation prompted by the complaints about Brown's statements to the basketball players, the District removed Brown as girls basketball coach. Brown agrees that being removed from a coaching position after student complaints is a negative part of one's record.

Brown's personnel file contains the memo of this investigation. He acknowledges that the memo reflecting sexually harassing remarks is a very negative part of his record, and that if someone were just to review that document it would give them reason to question his suitability to be coaching girls basketball.

After Brown was removed from that coaching job, the District gave him a second chance by assigning him as the assistant boys basketball coach at Topeka High School.

Brown was terminated as assistant boys basketball coach in 1989 for being absent and failing to perform some responsibilities or duties.

In 1991, Brown sued defendant, claiming race discrimination and retaliation under Title VII and Section 1981.

In his 2010 deposition, Brown unequivocally stated that no one in the District had ever personally criticized him for filing the 1991 lawsuit. In his Response, Brown references testimony from his 1994 deposition, in which he alleged that the Topeka High Principal, Dick Patterson, had told him that if he was asked for a reference about Brown, he would state that Brown should not be hired and that he was a person who had threatened to sue the District. Patterson left the District in 1994, and played no role in the decisions of Drs. McFrazier and Singer to subsequently refuse to rehire Brown.

In 1992, the jury and the Hon. Judge Richard Rogers ruled for defendant and against Brown. Brown appealed unsuccessfully, and attorneys' fees were awarded against him and his attorney. Judge Rogers ruled that the transfer from girls basketball coach to boys basketball coach had nothing to do with Brown's race or his having filed discrimination complaints.

Judge Rogers further ruled that Brown's discharge from the boys basketball position was because he failed to attend practices and games and failed to participate actively when he did attend, and that the discharge was not motivated by Brown's race or filing

discrimination complaints. Brown specifically agreed during his recent deposition that Judge Rogers was correct in those conclusions.

Judge Rogers issued a finding in 1992 that there was a thorough investigation of the complaints that Brown told a female student that she should dump her boyfriend, be treated to a candlelight dinner by Brown and "do the wild thing," and that Principal Nusbaum was convinced that Brown had made that statement. Although Brown claims he did not make those remarks, he admits that Dr. Nusbaum believes that he made those remarks.

Brown's personnel file includes a 1989 verbal reprimand for insubordination, for failure to completely follow instructions. Brown regards that reprimand as discipline and also as a negative part of his personnel file.

In 1990, Principal Abigail Calkin's evaluation of Brown noted that his professional skills need improvement, that his communication with groups and individuals was poor, that he is not self-motivated and that he relates to people very poorly.

Principal Barbara Davis, who is African-American, stated in an attachment to that evaluation that in her 27 years of being an administrator, she found Brown's performance as a physical education teacher to be less than that of other teachers in the areas of professional skills, interpersonal relationships, and especially personal characteristics.

If Brown were an administrator choosing between two applicants, one with negative evaluations such as that one and the other with favorable evaluations, he probably would hire the one with favorable evaluations.

Brown's personnel file reflects that in March, 1990, Principal Calkin gave him a written reprimand, which Brown regards as discipline and as a negative part of his file.

Brown's file also includes an October 9, 1991 letter from Principal Calkin asking that Brown be transferred out of her building at Quinton Heights school. She stated that he had not made changes to lead her to conclude that he can conduct a P.E. program that met

students' needs, and added that he showed no initiative to make changes in his behavior. She also said that for the benefit of the students, the school should have "a new and far better P.E. teacher." Brown considers this letter a negative part of his personnel file with defendant.

Promptly after Dr. Calkin's letter, the District transferred Brown out of Quinton Heights.

Dr. Billy Horn and Principal Calkin state in their February, 1992 evaluation that Brown's "professional skills [were] marginal at best," that he needed to improve his attention to detail, that his interaction with staff was minimal, and that he communicated when spoken to but very rarely initiated. Brown regards these comments as a negative part of his personnel file.

In his Complaint, Brown states that defendant refuses to re-employ him due to his "past history with Topeka Public Schools." Brown testified during his deposition that this "past history" meant his removal as girls coach, his removal as boys coach, his negative evaluations, his discipline and those negative parts of his record.

In 1996, Brown voluntarily resigned from his employment to move to Texas.

Brown taught special education at Washington High School in Kansas City, Kansas from 1999 to 2000, when his contract was not renewed. The letter of reference from Washington's Dr. Mary Viveros included an evaluation rating Brown unsatisfactory in three of nine categories, and stating that she would not re-hire Brown as a special education teacher, although she would recommend him for a different position. Brown regards that as a very negative reference concerning his teaching special education. He agrees that a negative evaluation is a fair thing for a prospective employer to consider.

In 2000, Brown applied for re-employment with District 501 and was interviewed by Human Resources Director Lynn King, who is African-American.

6

On August 27, 2001, King sent Brown a letter stating that "due to his past employment record," he would not be considered for rehire. The letter noted that Superintendent Robert McFrazier made the decision that Brown would not be rehired. Dr. McFrazier is African-American.

Brown knew at that time that the District was refusing to rehire him, but he kept inquiring anyway.

The District's attorney, Joe Zima, wrote a November 8, 2001 letter to the Phelps Law Firm, which then represented Brown. The letter referenced Brown's "poor teaching skills and an inability to follow directions." Brown saw Zima's letter at about the time Phelps received it, and it was clear to him that the District was saying that it was not going to hire him.

Although Brown continued to send additional letters asking King questions, King never said anything to Brown inconsistent with the August 27, 2001 letter. Rather, she reiterated the District's refusal to rehire Brown in letters on September 16, 2002, January 13, 2003 and May 23, 2003, again noting that Superintendent McFrazier has stated Brown was not being considered for re-employment. Brown agrees that King made clear in these letters that he would not be considered for the position at Highland Park High School or any other position in the Topeka Public Schools. After receiving those letters, it was clear in his mind that the District's decision was that it would not rehire him, and King has never said anything inconsistent with that.

Brown agrees that, if the District did not want to hire him because it thought he had not been a good employee in the past, that would not be discrimination.

In 2004, Brown filled in for a special education teacher on maternity leave at Marshall-Nemaha County Educational Services. The Director of Special Education later sent an October 19, 2004 letter regarding Brown's service, stating that he had "performed the minimum of what he was asked to do," and that all three paraprofessionals expressed

concerns about his lack of teaching, interaction and communication. (Brown Dep. Exh. 30). Brown does not controvert that the letter contains these statements, but states that the Director did not also make these negative comments when they spoke in person.

In 2004, Brown filed his second lawsuit against the District, Case No. 04-1193-DWB, claiming it refused to rehire him based on race and color discrimination and on retaliation. His Complaint contained almost the same allegations as in the current suit.

On September 1, 2005, the Hon. Donald Bostwick granted the District's summary judgment motion. He held that the suit was untimely, based on Ms. King's August 27, 2001 letter which stated the District would not rehire Brown, and the fact that Brown understood this. Thus, he ruled, the statute of limitations clock started on that date, and it did not re-start when the District sent subsequent letters re-stating its same basic position. The Tenth Circuit Court of Appeals affirmed this decision. 465 F.3d 1184 (10th Cir. 2006).

Brown was employed by St. Xavier's School District from 2006-2009, and St. Xavier informed him in April, 2009 that he was being non-renewed.

According to Brown's Complaint, the only position which the District prevented him from obtaining by discrimination or retaliation is the Highland Park High School head girls basketball coach. In his Response, Brown acknowledges that the Complaint does indeed only mention that position, but seeks to partially controvert this fact by citing his recent affidavit, showing that he "understood that this application would logically be considered for both a head coach and assistant coach position." (Dkt. 69, at 6, ¶ 45K). But the plaintiff has failed to show, as a factual matter, that it was District policy, where an application was made for a specific employment position, to consider applicants for other positions as well. More importantly, both the Complaint and the Pretrial Order frame the issues in the present action. As in the Complaint, the Pretrial Order stipulates that the only coaching job denied plaintiff through discrimination or retaliation was the Highland Park head girls basketball coach. (Dkt. 62, § 4(a)(vii)).

At 9:50 p.m. on June 30, 2009, Brown spoke with Highland Park Principal Dale Cushinberry while he and Cushinberry were at the YMCA. The parties dispute, and the evidence is unclear, whether this discussion occurred in the whirlpool or the locker room. Brown claims that Cushinberry told him "I would hire you in a minute." (Brown dep. at 91). He stated in his deposition that Cushinberry was talking about the position of assistant girls basketball coach, since the head coaching job was already filled. Brown never applied for the position of assistant girls basketball coach.

After talking with Cushinberry, Brown submitted job applications to the District's Human Resources Department, because he knew that the only way to be hired by the District is to submit a formal application through the Human Resources Department.

In his Response, Brown now argues that the District sometimes hired people outside of Human Resources. Brown makes no attempt to reconcile this contention with the repeated and unambiguous statements during his deposition that formal application was a District Requirement. (Brown Dep. at 88). Counsel for the District inquired, "Why did you go to the trouble of filling out formal job applications?" Brown responded, "Well, I had to do an application." Later, counsel observed, "Sure, because you can't get hired for a job in the School District unless you submit a formal job application, can you?" Brown, responded "Yeah. That's why I did an application." This was repeated a third time: "That's the only way to get hired by 501, isn't it, to submit it through the Human Resource Department?," Brown replied, "Oh, yes. Yes." Further, Brown has also acknowledged in his deposition that he knew that hiring is done by the District's Human Resources Department, and not by Cushinberry. He has no evidence that Cushinberry had hiring authority or ever in fact hired anyone.

Brown also knew that while a principal might recommend someone for hiring, Human Resources can either accept or reject that recommendation. Every time he had applied for a job with the District, he submitted a formal job application.

Brown formally applied to be the girls head basketball coach job at Highland Park High School on July 1, 2009. He applied for that job in case the then-current coach, Bill Baird, did not stay. He never applied for an assistant girls basketball coaching job at Highland Park High School. (Brown dep., p. 136,11.5-14).

Brown agrees that in considering his application for coaching jobs, it is reasonable for the District to consider how he did the last time he coached basketball for the District.

On September 21, 2009, Brown applied with the District to be a substitute teacher, even though no one at the District administrative office had told Brown that the earlier decision of Dr. McFrazier against ever rehiring Brown had been changed.

Daneva Coker, a District employee, invited Brown to meet with the District's Substitute Coordinator. However, Brown never went to meet with the Substitute Coordinator, because he was already substitute teaching in the Shawnee Heights School District. He knew that by not going to see her, he was not going to be hired by the District as a substitute teacher.

Brown now attempts to controvert this fact by citing his additional affidavit that he could not meet with the Substitute Coordinator because of his schedule as a substitute. But this directly contradicts his earlier deposition testimony that unequivocally stated that he did not attend the meeting because he already had a substitute teaching position, and that he knew that failing to attend the meeting would cause the District to refuse approving his application. (Brown dep. at 105, 107). Brown offers no justification for his attempt to directly contradict his prior sworn testimony.

The same day that he applied to District 501 to be a substitute teacher, Brown also submitted a formal application to be a special education teacher. The District had two available special education positions, but one of these was already filled by Cary Sauro, a qualified applicant. Brown agrees that if one applies for a special education job, it is

reasonable for the prospective employer to consider a prior reference about how the applicant did as a special education teacher.

Brown has testified that he was not hired "because of the lawsuits that I have" against the District. Asked in his deposition why he believed this, he alleged the District had used the "documented summary" — the investigation summary concerning the remarks to the female students — as a basis for its decision against hiring him.

On September 10, 2,009, Brown and his attorney Larry Michel met with the District's superintendent Dr. Kevin Singer, School District Attorney Cindy Kelly, and Board member Janel Johnson. Brown has testified that, going into the meeting, he had decided that he would either be hired or that he would file a lawsuit; the on1y way the District could have avoided a lawsuit would have been to hire him.

Brown has testified that his reference to race and color in his claims mean the same thing.

Brown's belief that he was discriminated against due to race or color is based on three reasons: (1) during the 1991 investigation of the comments Brown made to the girls basketball players, it is his belief that then-Principal Dr. Ned Nusbaum wanted to hire Lori Roenbaugh, a white basketball coach, to replace Brown, (2) the District's discovery responses indicating that all six substitute teachers hired to teach special education were white; and (3) that the District entered into a favorable settlement with, and continued to employ Charles Nadeau, a white employee complaining of reverse discrimination.

In the first action brought by Brown against the District, Case No. 91-4011-R, Judge Rogers concluded that Brown was replaced as the primary girls assistant basketball coach by Roenbaugh, but that the reasons for Brown's removal from the girls basketball program "had nothing to do with Brown's race," and that the District had demonstrated legitimate, nondiscriminatory, non-retaliatory reasons for its actions. *Brown v. Unified Sch. Dist. No. 501*, 1994 WL 478742 (D. Kan. 1994)).

Brown does not know if any African-Americans other than he even applied to be substitute teachers for special education. (Brown dep., p. 183,11.3-10).

Nadeau filed an EEOC Charge against the District, claiming he was treated unequally compared to African-American co-workers. The District entered into a compromise settlement of that claim on December 15, 2009. It is uncontroverted that Nadeau had never received negative performance evaluations with the District, and had not had any student or parental complaints of making harassing comments to students. Nadeau was supervised by Mark Wanamaker, Director of Campus Police and Ron Brown, Director of School Safety. Nadeau is the only non-black whom Brown claims was treated differently from or better than he was.

No one has ever told Brown that the District was not re-hiring him because he is African-American. Nor has anyone in the District's organization ever made racial slurs to Brown.

Asked during his deposition to identify all individuals employed by or acting on behalf of the District who committed discrimination or retaliation, Brown identified only Board member Ned Nusbaum and the District's attorney Dave Mudrick, and cites comments made by them during Board executive sessions on September 17 and October 1, 2009. This answer matches the plaintiff's Response to Defendant's Interrogatory 21, which only identifies Nusbaum and Mudrick as agents demonstrating retaliatory or discriminatory intent.

Brown states that during the September 17 session, Nusbaum stated that "all Mark wanted to do is sue us. He's sued us three times already."

In his deposition, Brown was asked about the basis for his retaliation claim, and why the District's decision did not simply reflect the negative information in his personnel file. Brown responded that it was "just my belief" that the District engaged in retaliation.

Asked if he had "anything backing up that belief other than the fact that you believe it?," Brown responded "No. No, I don't. No." (Brown dep. at 7-16).

Neither Dr. Nusbaum, Mr. Mudrick, nor the School Board made the decision not to reverse the October 27, 2001 decision not to re-hire the Brown. Instead, the decision not to reverse that decision was made by the District's Superintendent, Dr. Singer. Dr. Singer based that on his review of Brown's personnel file, including the various negative evaluations and the complaints about Brown's purported comments to the girls basketball players. Dr. Singer did not base his decision on or even take into account Brown's race or color or the fact that Brown had filed previous claims and lawsuits against the District.

Brown's attorney drafted Brown's EEOC Charge and submitted it on October 12, 2009. The EEOC Charge made no mention Dr. Nusbaum's and Mr. Mudrick's purported comments, and Brown never said anything to the EEOC about those comments. To Brown's knowledge, the EEOC never investigated those alleged comments. All Brown submitted to the EEOC about Dr. Nusbaum's alleged retaliation was the "documented summary" as to the 1991 sexual harassment investigation. Nor did he claim to the EEOC that Mr. Mudrick somehow discriminated against him.

Brown never filed a complaint against the District with the Attorney General of the United States.

Brown's claimed damages include $35,086 for cashing in his KPERS retirement fund to pay for child support, living expenses and mortgage expenses. He claims that he sustained these damages because the District did not re-hire him, although he would not have had to cash in that fund if his prior employer, St. Xavier's, had not non-renewed his contract.

Brown claims emotional distress damages in the amount of $110,000 for humiliation and embarrassment. Asked to explain these damages, Brown responded in his deposition that "I would just have to say that the whole thing is just frustrating." (Brown dep. at 219).

Asked about the embarrassment or humiliation, Brown cited newspaper articles from 1991 and 1992 relating to the sexual harassment investigation.

Brown has not lost any sleep or cried over the incidents involved in this case. He never told his family physician about being distressed, upset or depressed and has never told any physician, psychiatrist or psychologist that he had stress or anxiety. He has not sought professional counseling or help for his frustration. He has never used any medication for the alleged emotional, mental or other injuries claimed in this lawsuit.

Brown is not embarrassed or humiliated to be around his friends, because none of them believe the allegation that he made harassing remarks to the female students. Brown has not changed any of his customary activities such as working out.

Brown seeks $150,000 in punitive damages from the District, a public school district. Brown brought his claims pursuant to Title VII and 42 U.S.C. § 1981. He did not bring a claim under 42 U.S.C. § 1983.

In his Response to the Motion for Summary Judgment, Brown cites those portions of his employment record showing positive evaluations. He also cites positive evaluations he received while teaching in Manhattan, Kansas in 2002 and 2003.

Brown contends that, when he first heard about the allegations regarding his comments in 1989, he denied making the comments and did not know what they meant. He claims that Nusbaum's report as to the incident is inconsistent with the testimony of the girl who had advanced the initial complaint, and that his memo is not credible and is hearsay. But Brown fails to document any substantial inconsistencies. For example, he notes that K.R. responded "no" when asked if Brown ever asked her "why don't you drop your boyfriend and go out with me, I will show you some good plays." But K.R. only refused to agree to the question as asked. She proceeded to testify that Brown told her, "I think you should dump [your boyfriend] and I will show you what a real man is, and I will take you to my house and fix you a candlelight dinner and then we can do the wild thing."

(Case No. 91-4011 K.R. dep. at 10). The cited inconsistencies do not render K.R.'s testimony inherently incredible, and it is uncontroverted that Nusbaum believed K.R.'s statements. Nusbaum's investigation and report is relevant and admissible because it supplies information as to what the District believed about Brown's employment history.

In addition, Brown cites a statement by one of the District's attorneys during the 1991 case that, if the District really believed that Brown was trying to date students, they would have fired him. But this fails to demonstrate that the District was not legitimately concerned about Brown's comments to female students. The issue was not Brown actually dating students, but making inappropriate and offensive comments to them. The District had a justifiable interest in ensuring an educational environment free from such comments.

Brown points out that he was not terminated after Nusbaum's investigation, and that his status was changed from Calkin"s 1990 recommended probation to "renew contract." The recommendation of probation remained in Brown's file, however, including the observation by Dr. Livingston: "I share Dr. Cain's concern about your evaluation. I believe that you are capable of following Dr. Calkin's directions, which seem to me to be reasonable, and meeting her expectations for improved professional performance... *Please do not consider this to be an indication that your professional performance doesn't need to be improved. It does.*" (Pl. Exh. S) (emphasis added).

Brown stresses that he never received a "nonrenew" status during his employment by the District. He notes that in 1992, he received an evaluation which indicated that he "is doing a good job on his goals." (Brown dep. exh. 22). His 1992 evaluation, however, also stated: "Mark's professional skills are marginal at best. He continues not having students do warm-up exercises .... Classroom management and control is ... too often poor with the intermediate classes. Mark needs to improve also on his attention to detail.... Another area for improvement is following district curriculum." (*Id*).

Brown also cites testimony from King which he suggests shows that Dr. McFrazier issued his directive that Brown was not eligible for rehiring without consulting Brown"s personnel file, that McFrazier falsely stated that he had checked with a reference in Kansas City, and that McFrazier claimed to be worried about placing the district in a position to be "held liable" for Brown's rehire. (No. 04-1193-DWB, McFrazier dep. at 62). But the cited evidence fails to support these allegations. King testified simply that McFrazier issued his directive without an additional review of Brown's file because he was already familiar with Brown's history, and thus "he seemed to recall Mark without even having to look at the file." (King dep. at 23). No admissible evidence supports the claim as to the Kansas City reference.

Further, in the cited portion of McFrazier's deposition from the 2004 case, McFrazier was not expressing a fear the District might be "held liable" in a suit *by Brown*, but its opposite, that of exposing the District to potential suits *by prospective students.* He testified that the District could "be held liable for rehire" in light of "all this history," by which he specifically referenced Brown's negative evaluations, including the claims of sexual harassment. Noting Brown's history "at Topeka High School and working with these young ladies [and] those statements," McFrazier testified that the District erred in not firing Brown in 1991.

After Brown continued to send letters, King responded on September 4, 2002 by writing that Brown was not being considered for special education positions, that they had Brown's application on file in regard to coaching vacancies, and that she had "not been notified by the school/s administration that the positions have been filled." A copy of the letter was sent to attorney Joe Zima.

King sent another letter to Brown on September 16, 2002, stating that some special education vacancies were being filled by substitute teachers. The letter also reiterated Dr. McFrazier's statement that Brown would not be considered for rehire.

On January 13, 2003, King sent Brown a letter which included a bold passage highlighting the earlier District decision: "Dr. McFrazier indicated that you are not being considered for re-employment to the district." (Brown dep. exh. 36). King told Brown to send any further correspondence to the District's attorney.

On May 23, 2003, King sent Brown a letter denying him consideration for an open position in special education at Highland Park High School, and denying him consideration for any position available in the District. "Please," she wrote, "re-read the volume of previous responses to you on the subject of your rehire by the school district." (Brown dep. exh. 37).

According to Brown, during the years related to the three years prior to 2004, the District hired 36 white females, 8 white males, and 1 Hispanic female for special education positions, but did not hire any certified teachers of blacks. In addition, from August 2002 to May 2004, the District staffed 20 special education vacancies with substitutes, half of which were white females, six where white males, two were black females, and two were black males. However, the District correctly notes that the evidence submitted by Brown as to hiring results is not relevant to the alleged injury here, the refusal to rehire Brown in 2009. More importantly, the evidence of hiring results is meaningless without any additional information as to how may persons from different races applied for each position.

Next, Brown argues that, from 1999 to 2002, twelve complaints of racial discrimination or retaliation were brought against the District. In addition, in the last five years, eight further claims have been brought against the District. However, the plaintiff's evidence is again presented free from any context, in this instance, any information as to the validity of these claims. The defendant's evidence indicates that most of these claims were dismissed or otherwise found to lack merit.

Brown contends that the District has employed three other employees who had been accused of sexual misconduct involving a student. In addition, Brown contends that one District employee who has kept his job although he had been charged with driving under the influence.

However, the plaintiff's evidence fails to offer any indication that the evidence as to the employee with a DUI is predicated on personal knowledge. In addition, the retention of an employee charged (but apparently not convicted) of DUI is not relevant to the legality of the District's decision not to rehire a former employee who had been disciplined for sexual harassment. The evidence as to the other employees charged with sexual misconduct is potentially relevant, but the plaintiff supplies no evidence as to the nature the charges involved, the results of any investigation, and the potential discipline imposed by the District. Moreover, the District points out that one of these three employees is black. Even taken at face value, the plaintiff's evidence fails to show the existence of any racial disparity in its treatment of employees accused of harassment.

In his Response, Brown repeatedly cites his private "understanding" of the meaning of his conversation with Cushinberry. But it remains uncontroverted that Cushinberry's comments only related to the position of head coach for girls basketball. As Brown related in his deposition, "Oh, that's after Cush told me in the locker room that Bill Baird [who was then the head coach] may stay; he may not stay. So I went ahead and applied to the head coaching job." (Brown dep. at 98-99).

Brown admitted in his deposition that he knew that principals do not have hiring authority, and that employment requires a formal application. Brown only submitted a formal application for the position of head coach, a position which by that time had been filled. The uncontroverted facts establish that Brown knew it was District policy he would not be rehired, and the comments he cites from various District employees — who do not have hiring authority — do not alter the existence of that policy.

Brown did apply for substitute teaching, but did not attend a scheduled interview. Although he now, by affidavit, contends that this was due solely to a scheduling conflict, this directly contradicts, without explanation, his straightforward statement during his deposition that he decided to not to schedule an interview because he had obtained a similar position with another school district. Brown was asked, "In other words, then, even though you applied for a job and they invited you to come in for an interview, you decided not to take that job, didn't you?" Brown responded: "I was substituting for Shawnee Heights, doing the same thing for 501, If I was workin' for 501 workin' as a substitute teacher, I was doin' the same thing." (Brown dep. at 106).

In late August 2009, Brown spoke by phone with District board member Janel Johnson, who suggested they meet with District Superintendent, Dr. Singer. At Johnson's request, a meeting was held between plaintiff, his attorney, Johnson, District 501 attorney Cindy Kelly, and Dr. Singer on September 10, 2009. Brown said at the meeting that he was not threatening to bring a lawsuit; he merely wanted to go to work. Brown subsequently acknowledged in his deposition that at the time of the meeting he had resolved to sue the District if it did not hire him. Dr. Singer said the Board would take the matter up at its next meeting.

The District Board of Education met on September 17, 2009, and discussed Brown's employment status during its executive session.

According to Brown, Johnson told him the next day that the Board had not reached a decision, and wanted to hear from attorney Dave Mudrick, who had represented the defendant in the previous lawsuit. Brown also says that Johnson told him that Dr. Nusbaum (formerly a principal, later superintendent and now school board member) had said in the session that "all Brown wants to do is sue us. He has sued us three times already. All Brown wants to do is sue us." (Brown dep. at 158-59).

Even aside from its accuracy (Brown separately acknowledged in his deposition that he was resolved to sue the District if did not offer him employment), the cited passage is inadmissible hearsay, and Brown makes no attempt to explain how the evidence might be admissible evidence.

The Board conducted another executive session discussion on the subject on October 1, 2009. The purpose of this session was to obtain legal advice from Mudrick. In support of his claims of discrimination and retaliation, Brown contends that Mudrick made comments which caused the Board not to hire him. But the only evidentiary basis for these alleged comments is Brown's own testimony as to what he heard about the Board meeting through Johnson. (Dkt. 69, at ¶ 64). However, these alleged comments are not simply inadmissible hearsay. As the Magistrate Judge specifically found, the alleged comments reflect statements made by counsel in response to a request for legal advice, and are protected by attorney-client privilege. (Dkt. 59, at 11). Brown made no appeal from this ruling, and presents no rationale for disregarding it now.

Brown filed his EEOC charge of discrimination on October 15, 2009. Brown was provided with information which had been submitted to the EEOC by the District, and the investigator, Kalifah Hatten, offered Brown the chance to respond. Brown supplied a response, but did not mention the information concerning what Johnson allegedly told him about Nusbaum or Mudrick's statements at the executive session meetings.

Brown spoke with Hatten on January 21, 2011, and she told him that she could no longer speak with him, and that she had already faxed a right-to-sue letter to Brown"s attorney. Brown received his Notice of Right to Sue on or about January 21, 2010.

Brown alleges that his failure to obtain work at the District made it difficult to maintain his house payments and pay child support. He cashed out his KPERS retirement in an effort to save his home from foreclosure. He further states in his affidavit that he is embarrassed by not having a full-time job, particularly after so many years of teaching

experience and his being licensed for a specialty like Special Education, in which there is a shortage of teachers.

However, during his deposition, Brown indicated at most that he simply felt it was "frustrating" that he had not obtained a job. His testimony about feeling "embarrassed" was related to the nearly two-decades old newspaper articles that appeared in relation to the sexual harassment charges against him in 1991 and 1992. He further testified that he cashed in his KPERS retirement to pay for "child support, living expenses and mortgage issue," and that he would not have had to do so if his prior employer, St. Xavier's, had not non-renewed his contract (Brown dep. at 215-16).

## Conclusions of Law

### Title VII Exhaustion

The District argues that Brown's Title VII claims are barred because he did not exhaust his administrative remedies. Specifically, it argues that Brown's Title VII claims go beyond the scope of his EEOC charge, since that charge failed to make any mention of the alleged comments or statements by either Mudrick or Nusbaum. Since Brown acknowledged in his deposition that these are the only District officers who acted with a discriminatory or retaliatory animus in connection with his 2009 application, the District argues, he cannot now seek relief for these actions under Title VII.

The court will deny the District's motion on the grounds sought. Brown's EEOC charge explicitly advances a claim for Title VII relief based upon the District's refusal to hire him in 2009. His subsequent citation to the alleged comments of Mudrick and Nusbaum in connection with the decision not to rehire him are merely evidence in support of that complaint. As noted above, the court finds that Brown's evidence of these comments does not constitute admissible evidence. Nevertheless, the plaintiff was not required to

separately mention in the EEOC complaint all of the evidence which he believed would ultimately support his complaint. The court denies the District's motion on this ground.

The District also argues that Brown's Title VII claims are barred by his failure to seek a right-to-sue letter from the United States Attorney General. Title VII claims against a governmental entity require such approval. *Hiller v. Oklahoma ex rei. Used Motor Vehicle & Parts Comm 'n*, 327 F.3d 1247, 1250-51 (l0th Cir. 2003) (interpreting 42 U.S.C. § 2000e-5(f)(l)). This requirement "furthers the goals of the Civil Rights Act as remedial legislation by bringing the reluctance of governmental agencies to comply with Title VII to the attention of the Attorney General." *Thames v. Oklahoma Historical Soc y*, 646 F. Supp. 13, 16 (W.D. Okla. 1985), *aff'd per curiam*, 809 F.2d 699, 700 (l0th Cir. 1987).

The court finds that the failure to obtain prior approval specifically from the Attorney General is not fatal to Brown's Title VII claims. While the statute formally requires approval by the Attorney General, that officer, acting through the Department of Justice, has delegated that authority to the EEOC through 29 C.F.R. § 1601.28(d). *See Hiller*, 327 F.3d at 1250. The court in *Hiller* recognized "the futility of requesting such letters [from the Attorney General] when the requests are routinely denied." *Id*. at 1252. The court also observed that the purpose of the statute was effectively served where the EEOC issues a right-to-sue letter:

> Where the EEOC has not found reasonable cause sufficient to pursue the case further, however, the Attorney General's notice of right to sue would only be echoing the EEOC's determination not to proceed in the matter against the state governmental respondent. In such circumstances, the state entity does not need the protection offered by the Attorney General's participation in the administrative process.

*Id*. Accordingly, the court in *Hiller* found the equitable circumstances existed which excused the plaintiff's failure to obtain a right-to-sue letter from the Attorney General. The court finds the same result should obtain here.

## *Statute of Limitations*

However, the court finds that the District is entitled to summary judgment on the basis of its argument that the present discrimination and retaliation claims are time-barred under the relevant statutes of limitations. In doing so, the court concurs with Judge Bostwick's decision in 2004 that the plaintiff is seeking to revive and relitigate the sexual harassment charges leveled against him in 1991. This litigation is untimely in light of the statutes of limitations governing actions under Title VII and § 1981.

The parties concur as to the controlling statutes. Under 42 U.S.C. § § 2000e-5(e), the plaintiff was required to bring his Title VII action within 300 days of the alleged unlawful employment practice. The plaintiff was required to bring his § 1981 claim within the time provided for similar actions under Kansas law. In this case, that statute is the two-year limitations statute provided by K.S.A. 60-513. *Hawkins v. Lemons*, 2009 WL 2475130, *3 (D. Kan. Aug. 12, 2009).

The present action is premised on the District's policy of refusing to hire Brown. That policy was unequivocally announced in 2001. Brown has acknowledged receiving notice of the policy and understanding its application. The policy was instituted in the wake of repeated inquiries by Brown into returning to work for the District, and there is no basis in the evidentiary record for concluding that the District ever rescinded or altered this policy. Accordingly, the time for Brown's claims began to run when he received notice of that policy, which was either August 27, 2001 (when King wrote to Brown stating the District's decision that he would not be rehired) or November 8, 2001 (when his former attorney, the Phelps Law Firm, received a copy of the letter sent by Mr. Zima, stating the District's decision that Brown was not eligible for rehire). Judge Bostwick correctly decided in 2004 that the claims then advanced were untimely, and the additional delay of a further five years has not revived them.

In his Response, Brown points to his conversation at the YMCA with Principal Cushinberry as somehow retriggering the limitations period. But Cushinberry merely indicated during a casual conversation that "I would hire you in a minute." The statement itself clearly indicates both its personal ("*I*") and provisional ("*would* hire you") nature.

More importantly, Brown acknowledged in his deposition that he knew principals do not have hiring authority. This is true in general for all prospective employees, but Brown was not just any potential applicant. Even if Brown had supplied admissible evidence that principals might in some instances be allowed to conduct hiring (and he has not), his claims would still fail here since the District had previously and unequivocally announced its decision that Brown was not eligible for rehire. Brown has not even attempted to show that local principals have both hiring authority *and* the ability to overrule the District itself as to matters of school policy.

Here, the defendant announced that Brown was not eligible for rehire. Accordingly, Brown's ability to claim discrimination or retaliation must be measured from the date the District announced that policy. *See Castorena v. Runyon*, 1994 WL 146343, *1 (D. Kan. 1994). His current claims are untimely and subject to summary judgment.

### Collateral Estoppel and Res Judicata

Next, the District argues that Brown's claims are also subject to dismissal due to the preclusive effect of Judge Bostwick's 2004 decision. The District argues that *res judicata* applies, because Brown did or could have raised similar claims in his second action against the District. *See Lewis v. Circuit City Stores*, 500 F.3d 1140, 1147 (10th Cir. 2007). Citing *Kelly v. Boyles*, 2009 WL 3711578, *2 (D. Kan. Nov. 2, 2009). The District also contends that his claims are subject to collateral estoppel, as Judge Bostwick dismissed his prior action through summary judgment, Brown's earlier suit arose from the same cause of action, and the decision involved common questions of law and fact.

Brown argues that neither collateral estoppel nor *res judicata* have any application, because Judge Bostwick found only that the action was untimely, and did not reach the merits of the case. (Dkt. 69, at 40). But while Judge Bostwick held that Brown's 2004 action was untimely, and explicitly declined to "reach the other legal issues in the case," *Brown v. Unified Sch. Dist. No. 501*, 2005 U.S. Dist. LEXIS 46303 (D. Kan. Sept. 1, 2005), that does not mean that the decision was not "on the merits" for purposes of claim preclusion.

"The rules of finality, both statutory and judge made, treat a dismissal on statute-of-limitations grounds the same way they treat a dismissal for failure to state a claim, for failure to prove substantive liability, or for failure to prosecute: as a judgment on the merits." *Plaut v. Spendthrift Farm*, 514 U.S. 211, 228 (1995). It is accordingly binding on Brown and on this court. *See, e.g., Libaire v. Kaplan*, 395 Fed.Appx. 732, 735 (2nd Cir. 2010) (decision that "federal claims are time-barred precludes him from reasserting those claims"); *Elkadrawy v. Vanguard Group*, 584 F.3d 169, 173 (3d Cir. 2009) (dismissal of Title VII claim as time-barred is subject to *res judicata*); *Mills v. Des Arc Convalescent Home*, 872 F.2d 823, 826 (8th Cir.1989) ("a disposition of a Title VII action as untimely filed is a decision on the merits for purposes of *res judicata*"). Accordingly, Judge Bostwick's decision was a decision on the merits for purposes of claim preclusion, and the court will grant the defendant's motion on that basis.

### Section 1983 vs Section 1981

Next, the District argues that the court should also grant summary judgment as to plaintiff's claims under 42 U.S.C. § 1981, as such a claim is not properly advanced against a governmental entity. Section 1983 provides the exclusive remedy for damages against a state actor for civil rights claims. *Jett v. Dallas Independent School District*, 491 U.S. 701 (1989)

Brown agrees that his § 1981 action against the District is untenable, but argues that the defect is merely procedural, and that the proper remedy is to allow him to amend his

complaint to add a § 1983 claim. (Dkt. 69 at 43). In support of his argument, Brown cites several decisions authorizing such relief. *Bolden v. City of Topeka*, 441 F.3d 1129, 1137 (10th Cir. 2006); *Fulcher v. City of Wichita*, 445 F. Supp. 2d 1271, 1280 (D. Kan. 2006) (superseded on other grounds); *Dockery v. Unified School District No. 231*, 382 F. Supp. 2d 1234, 1240-1241 (D. Kan. 2005).

These cases are distinguishable in important respects. In *Bolden*, the plaintiff had previously advanced both § 1981 and § 1983 claims, and the Tenth Circuit specifically found that the former implicitly incorporated the allegations contained in the latter. 441 F.3d at 1129. Further, the plaintiff in *Bolden* appeared *pro se*. In *Fulcher*, leave to amend was allowed in response to a motion to dismiss, not a motion for summary judgment. In *Dockery*, the amendment was allowed prior to discovery.

Amendment was allowed in the cited cases because of a specific absence of prejudice, coupled with (in *Bolden*) specific good cause for the amendment, in the fact that the plaintiff was not an attorney. *Bolden*, which held that *Jett* did indeed require actions against state actors to be brought under § 1983 rather than § 1981, was controlling precedent for three years prior the to the present action. Plaintiff's counsel offers no showing of good cause for the failure to previously plead any reference to § 1983. (Dkt. 69, at 43-44). More importantly, amendment now will work substantial prejudice to the District and the court. Discovery is closed and trial is scheduled in less than two months. No discovery has been conducted on the existence of the District's policies or procedures. Allowing plaintiff to amend his claims now and for the first time advance a § 1983 claim would create prejudice by requiring additional discovery.

Given the absence of good cause justification and the substantial prejudice, amendment may be properly refused. *Semsroth v. City of Wichita*, 2006 WL 2570557, *4 (D. Kan. 2006). However, even were amendment allowed, it would fail to save plaintiff's case.

## Discrimination

Had Brown timely presented his claims of discrimination, summary judgment would remain appropriate, as the plaintiff has failed to demonstrate that the proffered reason for the decision not to rehire him was a pretext for discrimination. The parties agree as to the controlling, burden-shifting framework. *See Sanders v. Southwestern Bell Tel.*, 544 F.3d 1101, 1105 (10th Cir. 2008). This initially places the burden on the plaintiff to show the existence of a *prima facie* case of discrimination. If this burden is met, the defendant faces the burden of showing the existence of a legitimate, nondiscriminatory reason for its action. If the defendant provides such a reason, the plaintiff has the opportunity to show that the proffered rational was simply a pretextual mask for discrimination.

In the present case, the defendant contends that, even if Brown presented a *prima facie* case of discrimination, summary judgment should be granted because it had a legitimate reason in refusing to hire him, specifically the significant amount of negative information in his personnel file, including substantiated claims of making sexual inappropriate comments to the girls under his supervision.

The court finds that the District possessed a legitimate reason for deciding the Brown was not eligible for rehiring, and that the plaintiff has failed to demonstrate that this reason was prejudice. Shorn of the inadmissible hearsay and privileged attorney-client communications which Brown cites in connection with the 2009 Board executive sessions, Brown's arguments of pretext are restricted to (1) his conversation with Cushinberry stating that Cushinberry would hire him, and (2) a few citations to positive statements about his prior employment.

But, as noted above, it is uncontroverted that Cushinberry as a school principal had no hiring authority. Moreover, there is no evidence that Cushinberry was independently familiar with all of the negative information in Brown's file. Similarly, Brown points to the agreement by the substitute coordinator to schedule an interview with him in 2009. But,

again, there is no evidence that the coordinator knew of the District's prior determination that Brown was eligible for rehiring, and certainly no evidence that she had any authority to overrule it.

As for the positive information in Brown's employment records, a part of this evidence takes the form of positive evaluations from Brown's service with the Manhattan, Kansas schools, and there is no evidence that it was presented to District 501 for its evaluation. Moreover, in many instances the "positive" evaluations of Brown are coupled with distinctly negative caveats about his need for improvement. His record contained information that he had been disciplined for insubordination, and had been designated as ineligible for rehiring in Kansas City. But most importantly, there is uncontroverted evidence that the District had conducted an independent investigation of charges of sexual harassment against Brown, and had concluded that he had made inappropriate, sexually-charged comments to two minor female students. There is no evidence that the District concern as to this negative employment record was not advanced in good faith, and the role of the court is not to determine if the District fairly weighed the positive and negative aspects of Brown's employment history. *See Swackhanmer v. Sprint/United Mgt.*, 493 F.3d 1160, 1169-70 (10th Cir. 2007) (plaintiff does not establish pretext merely by showing "that the employer should not have made the termination decision — for example, that the employer was mistaken or used poor business").

## Retaliation

Further, were the court to find that the present claims of retaliation were not barred by limitations or the effect of plaintiff's prior lawsuits, the defendant would also be entitled to summary judgment on these claims on the merits. Such claims require that the plaintiff engaged in a protected employment activity, and that this caused a subsequent adverse employment action. *Fye v. Oklahoma Corp. Com'n*, 516 F.3d 1217, 1228 (10th Cir. 2008). Or

the plaintiff may show that retaliation played a motivating factor in the employment decision by presenting evidence directly reflecting the retaliatory motive. *Id*. at 1226.

Plaintiff has failed to present any admissible evidence that his protected employment activity (filing his 1991 and 2004 lawsuits) somehow caused the decision not to rehire him in 2009, or that the District acted with a retaliatory motive. As noted earlier, Brown's reliance on what was purportedly stated during the 2009 executive sessions is inadmissible hearsay. *See Burns v. Board of County Com'rs of Jackson County*, 330 F.3d 1275 (10th Cir. 2003) (holding that plaintiff's testimony about what he heard had been said at county commission meeting was inadmissible hearsay). Further, the reputed speakers (Nusbaum and Mudrick) were not the decision makers with respect to the 2009 decision. Rather, Dr. Singer decided not to overturn Dr. McFrazier's 2001 determination that Brown should not be rehired. Brown acknowledged during his deposition that it was "just my belief" that the District's 2009 decision was retaliation for his earlier lawsuits. By the time of his 2009 application, those lawsuits were five and eighteen years old, preventing any inference of retaliation based on temporal proximity alone. *See Piercy v. Maketa*, 480 F.3d 1192, 1198 (10th Cir. 2010) (court may infer causation by "close temporal proximity").

The District also presents arguments seeking partial summary judgment as to some of Brown's damages claims, in the event that the court denies its broader motion. Given the court's findings herein, the court need not address the District's damages arguments.

IT IS ACCORDINGLY ORDERED this 2nd day of June, 2011, that the defendant's Motion for Summary Judgment (Dkt. 63) is hereby granted.


s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE